## Valley National Bank of Lebanon *v.* Samuel Urich, Appellant.

*Promissory notes—Parol waiver of protest —Province of jury.*

In an action against an indorser upon promissory notes which have not been protested, a verdict and judgment for plaintiff will be sustained, where the jury find upon sufficient testimony that the notes had not been protested in consequence of an oral request of plaintiff not to protest them.

After an indorser of promissory notes has requested the holder not to protest his notes, the mere fact that the holder occasionally protests a note to secure attention to its renewal will not defeat his right to recover against the indorser on notes not protested.

When a waiver of protest consists of verbal communications, it is the special province of the jury to consider the testimony and ascertain the facts. When ascertained, it is their duty to apply the law under the direction of the court.

Argued Feb. 15, 1899. Appeal, No. 365, Jan. T., 1898, by defendant, from judgment of C. P. Lebanon Co., June T., 1896, No. 212, on verdict for plaintiff. Before STERRETT, C. J., GREEN, McCOLLUM, MITCHELL and FELL, JJ.

Assumpsit against indorser of promissory notes. Before

SIMONTON, P. J., of the 12th judicial district, specially presiding.

The facts appear by the opinion of the Supreme Court.

Verdict and judgment for plaintiff for $10,498.75. Defendant appealed.

*Error assigned* was in submitting the case to the jury.

*Isaac Hiester*, with him *A. Stanley Ulrich*, for appellant.—No principle of the law merchant is better settled than that demand and notice of the nonpayment of a negotiable note is essential in order to hold the indorser, unless such demand and notice be clearly and distinctly waived, either orally or in writing, or by acts clearly calculated to mislead the holder and prevent him from treating the note as he otherwise would have done. So strict is this rule that notice is indispensably necessary though the maker is known to be insolvent: Barton v. Baker, 1 S. & R. 334; though the maker is dead and the indorser is his administrator: Juniata Bank v. Hale, 16 S. & R. 157; Groth v. Gyger, 31 Pa. 271; or though the indorser has collateral sufficient to indemnify them: Kramer v. Sanford, 4 W. & S. 328. Nor is knowledge of nonpayment notice, for the notice must assert that the holder intends to stand on his legal rights and resort to the indorser for payment, and the argument that the indorser received no injury from the want of notice will not prevail. Notice is an essential part of the plaintiff's case, and even a verdict would not cure the omission: Juniata Bank v. Hale, 16 S. & R. 157; Mallory v. Kirwan, 2 Dallas, 192.

To show a waiver of demand and notice there must be clear and unequivocal evidence. Equivocal circumstances or agreements will not suffice: Annville Nat. Bank v. Kettering, 106 Pa. 531; 2 Daniel on Negotiable Instruments, sec. 1091; Harvey v. Turner, 4 Rawle, 234.

*Howard C. Shirk*, with him *S. P. Light* and *Charles H. Killinger*, for appellee, cited Annville Nat. Bank v. Kettering, 106 Pa. 531; 2 Daniel on Negotiable Instruments, sec. 1100; Oxnard v. Varnum, 111 Pa. 194; Churchman v. Smith, 6 Wharton, 153; Cooper v. Altimus, 62 Pa. 490; Burkholder v. Stahl, 58 Pa. 371.

OPINION BY MR. JUSTICE GREEN, May 22, 1899:

The only question at issue in this case was whether the plaintiff abstained from protesting the notes in suit in consequence of the request of the defendant to that effect. It was a pure question of fact. A very considerable amount of testimony was taken, especially on the part of the plaintiff, and the defendant gave evidence himself in support of his own contention. The question was very carefully explained and submitted to the jury with suitable comments by the learned court below, and the jury found in favor of the plaintiff, thereby determining that the defendant had requested the plaintiff not to protest his notes, and that it was in consequence of that request that the plaintiff no longer protested his maturing notes. That there was abundant testimony to support the finding of the jury will readily appear by a few citations. Thus, Mr. Reinhoel testified that he was cashier of the plaintiff's bank and that the notes were not protested because of the defendant's request to that effect. He was asked: " Q. Will you please state whether any of these notes that you have now referred to have been protested at maturity? A. No, sir, they were not. Q. Why were they not protested? A. Because he did not want them protested. Q. Please state when he made the request that the notes should not be protested. A. At the time he ceased making his notes payable in Philadelphia, payable at our bank. Q. When was that? A. Either December, 1893, or January, 1894, around there, somewhere. Q. Where were his notes at first generally made payable? A. At Philadelphia. Q. What occurred? A. Sometimes protested. Q. What occurred with regard to future handling of notes? A. Made them payable at our bank, said that he could control them better, three days of the week he was in Philadelphia and three days in the week at Myerstown, besides if they were protested he would have to pay it out of his own pocket and he did not care to have the notes protested, it looked as if he did not take care of his notes. Q. What did he say? A. He kicked against that. Q. I mean with regard to the future? A. Not at any time, none of them. . . . Q. What did he say with regard to the protesting? A. That he did not want them protested. Q. Did he make any request with regard to the protesting or nonprotesting subsequent to that time? A. Often. Q. To whom?

A. To me and the cashier.   Q. To the cashier in your presence?
A. Yes, sir.   Q. Who was cashier then?   A. Jacob Karch.
Q. What was it he requested to be done then?   A. The same
thing, that the notes should not be protested.   Q. And when
was the last time when he made that request that you can
recall?   A. Somewhere around the first of April, 1895."   An-
other witness, a teller in the bank, named Carmany, gave simi-
lar testimony.   He was asked, speaking of the note in suit:
" Q. You are aware that a number of notes are now held by the
bank?   A. I am.   Q. They were discounted for him—they were
not protested?   A. Yes, sir.   Q. Will you please state the rea-
son for their nonprotest if you know the reason?   A. The an-
swer is that Mr. Urich requested the cashier not to protest
them.   Q. Were you present when the request was made?
A. I was.   Q. When was it?   A. During the year 1894 and
1895.   Q. Can you tell us what Mr. Urich said to the cashier?
A. Well, I was working at my desk and I overheard a conver-
sation; he said it was not necessary to protest them; he would
have to pay them at any rate and he was perfectly good for
them; it was not necessary to make the unnecessary expense.
Q. Were you present at any other conversations that were had
or requests made by Mr. Urich with regard to the protesting of
his paper?   A. On more than one occasion he requested the
cashier not to protest them. . . . Q. On how many occasions did
you hear him refer to this matter, that is Mr. Urich?   A. Well, it
may have been half a dozen or more."   Another witness, Miller,
also a teller, was asked: " Q. Can you tell whether anything was
said by Mr. Urich to any of the officers of the bank, and if so
to whom, with reference to the protest or nonprotest of such
papers that might be discounted by them?   A. The orders were
not to protest any notes.   Q. By whom were the orders given?
A. Mr. Urich himself.   Q. To whom?   A. Cashier in the pres-
ence of the rest. . . . Q. Please state when these orders were
given?   A. That I can't give positively, I can't give any dates.
Q. As near as you can.   A. From the time he commenced
dealing with us, I don't know when that was.   Q. Can you tell
us approximately?   A. I don't know, 1894, around there.   From
the time he started dealing with us the orders were we should
not protest any papers.   Q. What did he say?   A. Not to pro-
test anything.   Q. That was the request, you say, made to the

cashier in the presence of you and the rest of the boys in bank?
A. Yes, sir."

In the face of such evidence as the foregoing, it matters
nothing what kind of testimony the defendant gave on these
subjects.   He was the defendant in the case and therefore
vitally interested in the result.   The plaintiff's witnesses were
disinterested, and any jury would be entirely justified in reject-
ing his testimony altogether, and in giving credence to the
plaintiff's witnesses instead.   It was a matter exclusively for
the jury, it was their province only to determine whom they
would believe and whom they would disbelieve.   No argument
in this Court founded upon the truth of the defendant's testi-
mony, and the untruth of the testimony given by the plain-
tiff, could have the slightest weight or be entitled to the least
consideration, because that is a matter with which the jury
alone must deal.   But in point of fact the testimony given by
the defendant, after he had undergone the process of cross-ex-
amination, did not in any serious sense contradict the testimony
of the plaintiff's witnesses.   Very reluctantly he was obliged to
admit, and did admit, that he did at various times request the
cashier not to protest his notes.   His claim was that he had
not given any general instructions not to protest any of his
notes.   He did admit, even upon his examination in chief, that
he had made such a request as to certain specified notes.   On
cross-examination, he was asked: " Q. Do you deny having
asked Karch (cashier) in the presence of Mr. Reinhoel, about
the time that you changed the place of payment of your notes,
that he should not protest any notes that they might discount
for you payable at the Valley National?   Mr. Funck: That the
witness has not said.   Q. Don't you know that you did make
a request at that time, just in that way, asking the cashier not
to protest your paper; that it would simply throw the expense
on you?   A. I did ask him that if I didn't provide for the
note in time.   Q. That is you did ask him not to protest any
of your notes provided you did not provide for their renewal
in time?   A. Yes, sir."   As all the notes in suit were past
due and were unprovided for as to their renewal, they would
naturally fall within the category which the defendant admitted
by his answer to the last preceding question.   On his further
cross-examination he was confronted with numerous instances

in which he had renewed after maturity, notes which were not protested, thus recognizing his obligation to renew such paper in such circumstances. But it is not necessary to pursue the discussion on this line. The whole defense set up on this ground is utterly fallacious. The argument is that the bank agreed not to protest any of his paper, and nevertheless violated its agreement by actually protesting a number of notes, and hence deprived themselves of the right to collect any of the notes which were not protested. This contention simply overlooks the fact that the agreement by the bank not to protest was the granting of a favor and not the breach of a contract founded upon a consideration. They consented, because the defendant requested not to protest his maturing paper. This was not the making of a contract founded upon a consideration, and the fact of an occasional protest of some of the paper was a matter of not the least consequence in any legal point of view. The matter was fully explained by the witnesses, all of whom testified that these occasional protests were only made because of the defendant's delay in providing for the renewal of his notes. He would let them lie over for days at a time without attention, and then they protested them to remind him of his duty, to prod him, as one witness said. As they had a perfect legal right to protest them in any event if they chose, they were entirely justified in doing so when the defendant neglected to perform his part of the arrangement, to wit: to take care of his maturing paper. It is only necessary to add in this connection that this defense comes with a very bad grace from this defendant who had received from the plaintiff every dollar which it now claims to recover, in the hope of escaping liability to repay his own indebtedness to it. We certainly should not be astute to give sanction to such a defense in the circumstances developed by the testimony. It only remains to say, so far as any legal question arising in the case is concerned, it is all settled by the decision of this Court in the case of Annville Nat. Bank v. Kettering, 106 Pa. 531. It was a case in which a parol general waiver of protest was made by the defendant in advance and as to all his subsequent paper. The court below held that, notwithstanding the waiver of protest, the paper must be presented for payment and payment demanded just as if there had been no waiver, and that this must appear in the

testimony. But this Court held otherwise and reversed the judgment. The present Chief Justice, delivering the opinion, said: "No principle of the law merchant is better settled than that demand and notice of the nonpayment of a negotiable note may be waived by the indorser, either orally or in writing, or by acts clearly calculated to mislead the holder and prevent him from treating the note as he otherwise would. . . . It is not essential that the waiver should be in writing. When the fact is established by competent evidence a parol waiver is as binding as a written one. . . . The general principle underlying nearly all cases of waiver is, that the indorser has by word or deed done something calculated to mislead the holder and induce him to forego the usual steps to fix the liability of the former. . . . A waiver of protest before maturity of a note is a waiver of all the steps leading to it and includes demand and notice of nonpayment. . . . When the alleged waiver is in writing, its construction is for the court, but when it consists of verbal communications, it is the special province of the jury to consider the testimony and ascertain the facts. When ascertained, it is their duty to apply the law under the direction of the court."

As the present case was tried in precise accordance with these principles, there was no error in the trial, and the assignments are all dismissed.

Judgment affirmed.